Virginia **PRADO ALVAREZ,** et al., Plaintiffs

v.

**R.J. REYNOLDS TOBACCO CO.,** Defendant

No. Civ. 03–1645(JP).

United States District Court, D. Puerto Rico.

April 5, 2004.

Amarilys Arocho–Maldonado, Arocho Maldonado Law Office, Utuado, PR, Archie Jennings, St. Thomas, VI, Myrna E. Ayala–Diaz, Edif Asociacion de Maestros, Hato Rey, PR, for Plaintiffs.

Diane P. Flannery, Emily C. Baker, James R. Johnson, Jason E. Keehfus, John F. Yarber, L. Christine Buchanan, Ryan E. Harden, Robin A. Schmahl, Jones, Day, Reavis & Pogue, Atlanta, GA, Rosalie Irizarry–Silvestrini, Clotilde Rexach–Benitez, Fiddler Gonzalez & Rodriguez, P.S.C., Hato Rey, PR, Jorge R. Roig–Colon, Fiddler, Gonzalez & Rodriguez, San Juan, PR, for Defendant.

### *OPINION AND ORDER*

PIERAS, Senior District Judge.

## I. INTRODUCTION

Decedent, who smoked Winston cigarettes for over 40 years, died from a cigarette-related illness. Plaintiffs now bring the instant complaint alleging that Defendant marketed a defective, unreasonably unsafe product to consumers, failed to warn consumers as to the dangers of the product, and willfully manipulated nicotine levels in cigarettes to ensure consumer addiction to cigarettes. Plaintiffs claim that Defendant is therefore strictly liable for the damages they suffered as a result of Decedent's death. In the alternative, they allege that Defendant's conduct was negligent. Finally, Plaintiffs allege that Defendant committed fraud by marketing a product it knew was inherently dangerous and by actively concealing information about the dangers of smoking from the public.

Defendant R.J. Reynolds now moves for summary judgment (**docket No. 80**), stating that all Plaintiffs' claims in negligence and strict liability are precluded by the doctrine of conflict preemption, that Plaintiffs have not provided evidence that Defendant's product was defective, that Plaintiffs have not provided evidence that a safer design of their product was feasible,

that Defendant had no duty to warn Decedent of the dangers of smoking, that this alleged failure to warn was not the cause of the Decedent's addiction to smoking, that there is no evidence to support Plaintiffs' fraud, misrepresentation, and concealment claims, that Plaintiffs' addiction claims are time-barred, and that there is no evidence that Defendant violated Article 189 of the Puerto Rico Penal Code. Plaintiffs' oppose Defendant's motion (**docket No. 111**).

## II. UNCONTESTED FACTS

The following are the uncontested facts, as agreed to by the parties and submitted to the Court (docket No. 78):

1. Plaintiff Virginia Prado Alvarez and Decedent were married. (*See* First Am. Compl. ¶¶ 2, 4.)

2. Plaintiffs Mayra Janette García Prado, Edgardo García Prado, Orlando García Prado, Ivellise García Prado, Francisco García Prado, Javier García Prado, and Carmen García Prado are the children of Plaintiff Virginia Prado Alvarez and the Decedent. (*See* First Am. Compl. at ¶ 3.)

3. Joham García Adorno is the grandchild of the Decedent. (*See* First Am. Compl. at ¶ 3.)

4. Francisco García López, the decedent, was born June 12, 1934. (8/18/03 V. Prado Dep. at 7.)

5. Mr. García López died on October 13, 2002.

6. No autopsy was performed on the Decedent at the family's request. (8/18/03 V. Prado Dep. at p. 130.)

7. R.J. Reynolds Tobacco Company ("Reynolds") is a New Jersey corporation with its principal place of business at Fourth & Main Street, Winston–Salem, North Carolina, 27102. (Reynolds' Answer to Plffs.' First Am. Compl. at ¶ 5.)

8. Reynolds, as a corporation, acts through its directors, officers and employees, to the extent those individuals are acting within the scope of their employment. (Reynolds' Answer to Plffs.' First Am. Compl. at ¶ 8.)

9. At all relevant times, Winston cigarettes were designed, tested, manufactured, marketed and sold by Reynolds. (Reynolds' Answer to Plffs.' First Am. Compl. at ¶ 5.)

10. The cigarettes manufactured by Reynolds, including Winston, have been marketed and sold in the United States, and Puerto Rico. (Reynolds' Answer to Plffs.' First Am. Compl. at ¶ 5.)

11. Reynolds marketed and sold Winston cigarettes in Puerto Rico from 1954 to the present date. (Reynolds' Response to Plffs.' First Set of Interrogatories at No. 3; *see also* Reynolds' Response to Plffs.' First Set of Requests for Admissions of Fact at No. 30.)

12. Decedent began smoking in 1960 at age 25. (8/18/03 V. Prado Dep. at pp. 14–15.)

13. "[Y]ears ago" Plaintiffs Virginia Prado Alvarez and Mayra Janette García Prado, the Decedent's daughter, talked about how the Decedent was smoking too much. (8/21/03 M. García Dep. at pp. 22–23.)

14. Decedent did not want his children to smoke "because then they become addicted to smoking." (8/18/03 V. Prado Dep. at 28.)

15. The only brand of cigarettes the Decedent used was Winston. (V. Prado Aff. at ¶ 2.)

16. Winston cigarettes always have contained tobacco and nicotine is a

naturally occurring constituent of tobacco. (Reynolds' Response to Plffs.' First Set of Requests for Admission of Facts at No. 41, 31.)

17. Winston king size full flavor cigarettes are manufactured utilizing white paper with cork color tipping paper. (Reynolds' Response to Plffs.' First Set of Requests for Admission of Facts at No. 36.)

18. Reynolds has advertised cigarettes to adult smokers in the United States, including Puerto Rico, and has advertised some or all of its products in printed media, on billboards and by other legally permissible means. (Reynolds' Answer to Plffs.' First Am. Compl. at ¶ 6, 31.)

19. Reynolds admits that its cigarettes were expected to reach adult consumers. (Plffs.' Initial Scheduling Conference Memo at p. 5.)

20. The manufacture, transport and sale of cigarettes is legal under federal law and the laws of the Commonwealth of Puerto Rico. (Plffs.' Resp. to First Request for Admission of Facts, Request No. 14.)

21. The federal government has enacted legislation directly addressing smoking and health on at least seven occasions since 1965. (*Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, at 137, 151, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000)).

22. From 1966–1970 every package of cigarettes sold by Reynolds in the States, territories, including Puerto Rico, districts and other areas subject to the Federal Cigarette Labeling and Advertising Act, contained the warning "CAUTION: Cigarette Smoking May Be Hazardous To Your Health."

23. From 1970–1985 every package of cigarettes sold by Reynolds in the States, territories, including Puerto Rico, districts and other areas subject to the Federal Cigarette Labeling and Advertising Act, contained the warning "WARNING: The Surgeon General Has Determined That Cigarette Smoking Is Dangerous To Your Health."

24. From 1985 until the present every package of cigarettes sold by Reynolds in the States, territories, including Puerto Rico, districts and other areas subject to the Federal Cigarette Labeling and Advertising Act, has contained one of four rotating warnings: (1) "SURGEON GENERAL'S WARNING: Smoking Causes Lung Cancer, Heart Disease, Emphysema, And May Complicate Pregnancy," (2) "SURGEON GENERAL'S WARNING: Quitting Smoking Now Greatly Reduces Serious Risks To Your Health," (3) "SURGEON GENERAL'S WARNING: Smoking By Pregnant Women May Result In Fetal Injury, Premature Birth And Low Birth Weight," or (4) "SURGEON GENERAL'S WARNING: Cigarette Smoke Contains Carbon Monoxide."

25. In 1969, the federal government amended the Federal Cigarette Labeling and Advertising Act to prohibit cigarette advertising on any medium of electronic communication subject to Federal Communication Commission jurisdiction. (15 U.S.C. § 1335).

26. The Federal Cigarette Labeling and Advertising Act requires the Federal Trade Commission to report annually on "current practices and methods of cigarette advertis-

ing and promotion." (15 U.S.C. § 1337).

27. Cigarettes have significant and inherent health risks for a number of serious diseases, and may contribute to causing those diseases in some individuals. (Reynolds' Answer to Plffs.' First Am. Compl. at ¶ 9.)

28. In response to consumer demand and public concern and criticism over the alleged health risks associated with smoking, Reynolds has, over time, developed many technological innovations that have produced a progressive decline in sales-weighted average "tar" and nicotine yields in cigarettes. Since the mid–1950's, Reynolds and its competitors have devoted extensive resources to achieve this decline. Techniques incorporated in cigarettes over the last 40+ years which reduce "tar" and nicotine include: tobacco blending, filtration, reconstituted tobacco, increased paper porosity, reduced tobacco weight, expanded tobacco, and filter ventilation. Design changes such as the development of more porous cigarette paper, improved filtration, and the use of expanded tobacco and reconstituted tobacco made general reduction possible. By utilizing one or more of these techniques, cigarette manufacturers can offer smokers a variety of cigarettes with a range of "tar" and nicotine levels. Indeed, today there are commercially available cigarettes that yield "tar" and nicotine at exceptionally low levels. Reynolds and its competitors developed many technological innovations that resulted in a progressive decline in sales-weighted average "tar" and nicotine yields in cigarettes—from about 38 mg "tar" per cigarette in the 1950's to about 12 mg "tar" per cigarette today, and from about 2.7 mg nicotine in the 1950's to about 0.8 mg nicotine per cigarette today. As a consequence, the sales-weighted average "tar" and nicotine yields of U.S. cigarettes have declined by 67% during the past 40–plus years. These "tar" and nicotine reductions have largely been achieved through innovations in cigarette design—innovations pioneered by Reynolds and its competitors in the United States. The 1979 Surgeon General's Report listed more than 25 different design techniques that reduce yields of "tar" and nicotine. Each of these techniques has been well publicized and known to the government, public health, scientific, and even lay communities.

Reynolds states that the benefits of smoking that have been frequently mentioned by smokers or that have been noted in the scientific and medical literature, are:

— pleasing taste and aroma

— satisfaction

— reduced stress and anxiety

— stimulation

— increased concentration

— improved memory retention

— improved information processing

— increased alertness

— alleviation of boredom and fatigue

— improved performance of repetitive or sustained tasks

— decreased aggression

— decreased fear and anxiety

— decreased sensitivity to pain

— facilitation of social interaction

Some of the above referenced factors are discussed in:

— Cessation of Smoking, Part V, The Health Consequences of Smoking: A Report of the Surgeon General (1982)

— Role of the Physician in Smoking Cessation, Ch. 9, The Health Consequences of Smoking: A Report of the Surgeon General (1984)

— Community Studies of Smoking Cessation and Prevention, Ch. 10, The Health Consequences of Smoking: A Report of the Surgeon General (1984)

— Smoking Intervention Programs in the Workplace, Ch. 12, The Health Consequences of Smoking: A Report of the Surgeon General (1985)

In addition, Reynolds states that it was acknowledged in the 1964 Report of the Advisory Committee to the Surgeon General of the United States (at p. 356) that:

> Medical perspective requires recognition of significant beneficial effects of smoking, primarily in the area of mental health.

> These benefits originate in a psychogenic search for contentment and are measurable only in terms of individual behavior. Since no means of quantitating these benefits is apparent the Committee finds no basis for a judgment which would weigh benefits versus hazards of smoking as it would apply to the general population.

(Reynolds' Response to Plffs.' First Set of Interrogatories at No. 7.)

> In 1957, the Surgeon General of the United States and the Director of the National Cancer Institute testified before Congress that no warning was necessary; the Surgeon General's Advisory Committee in 1964 stated that cigarette smoking was not "addictive." (Included in Plaintiffs' uncontested facts in their scheduling order in this case.)

29. Reynolds participated in the establishment of the Tobacco Industry Research Committee, that later became to be known as the Council for Tobacco Research—U.S.A., Inc. ("CTR") to fund research into smoking and health related issues. (Reynolds' Response to Plffs.' First Set of Interrogatories at No. 20; 9/19/03 H. McAllister Aff. at ¶ 4.)

30. Reynolds, through the Council for Tobacco Research, funded independent scientific research into the diseases associated with smoking at medical schools, universities and research institutions across the United States. (9/19/03 H. McAllister Aff. at ¶ 7.)

31. The Council for Tobacco Research's Scientific Advisory Board determined what studies would be funded. (9/19/03 H. McAllister Aff. at ¶ 8.)

32. Since CTR's inception in 1954 until its dissolution in 1998, Reynolds contributed over $100 million to enable that organization to fund research by independent scientists into the claimed relationship between cigarette smoking and human disease. From 1954–1999, the Council for Tobacco Research provided over $300 million to fund more than 1,600 projects for scientific research by over 1,100 scientists at over 300 medical schools, universities and research institutions. (Reynolds' Response to Plffs.' First Set of Interrogatories at No. 20; 9/19/03 H. McAllister Aff. at ¶ 7.)

33. Reynolds admits that Dr. David A. Kessler testified before a congressional subcommittee in 1994.

34. United States federal statute 15 U.S.C. § 1331 states:

It is the policy of the Congress, and the purpose of this chapter, to establish a comprehensive Federal Program to deal with cigarette labeling and advertising with respect to any relationship between smoking and health, whereby—(1) the public may be adequately informed about any adverse health effects of cigarette smoking by inclusion of warning notices on each package of cigarettes and in each advertisement of cigarettes; and (2) commerce and the national economy may be (A) protected to the maximum extent consistent with this declared policy and (B) not impeded by diverse, nonuniform, and confusing cigarette labeling and advertising regulations with respect to any relationship between smoking and health.

(Reynolds' Response to Plffs.' First Set of Requests for Admission of Facts at No. 20.)

35. Reynolds admits that nicotine can be consumed through means other than smoking. (Reynolds' Response to Plffs.' First Set of Requests for Admission of Facts at No. 46.)

36. Cigarettes contain nicotine and nicotine occurs naturally in tobacco. Reynolds states that many people believe that cigarette smoking (or the nicotine in cigarette smoke) is "addictive" and, as that term is commonly used today (i.e., to describe a behavior that is hard to quit), it is. Many smokers find it difficult—and some find it extremely difficult—to quit, including the estimated 50 million Americans who have quit smoking since 1964.

However, Reynolds disagrees with characterizing smoking as being addictive in the same sense as heroin, cocaine or similar substances. Any smoker with a sincere desire and determination to stop smoking can—and should—quit. Notably, the term addiction has meant different things to different people at different times. For example, in 1964, the Advisory Committee to the Surgeon General distinguished between "addiction" and "habituation," adopting the following definition for "addiction":

Drug addiction is a state of periodic or chronic intoxication produced by the repeated consumption of a drug (natural or synthetic). Its characteristics include: (1) an overpowering desire or need (compulsion) to continue taking the drug and to obtain it by any means; (2) a tendency to increase the dose; (3) a psychic (psychological) and generally a physical dependence on the effects of the drug; and (4) detrimental effect on the individual and society.

Applying this classic definition of "addiction," which distinguishes between many common activities, such as drinking coffee, and classic drugs of abuse, the Advisory Committee concluded that cigarette smoking is not "addictive," but rather that it is a habit. Cigarette smoking and/or nicotine are not "addictive" in the same sense as heroin, cocaine or similar substances and any smoker with a sincere desire and determination to stop smoking can do so. (Reynolds' Answer to Plffs.' First Am. Compl. at ¶ 16; Reynolds' Response to Plffs.' First Set of Interrogatories at No. 15.)

37. The Surgeon General of the United States in congressional testimony stated that cigarette smoking was

not "addictive"; and that an estimated 50 million Americans have quit smoking since 1964. (Included in Plaintiffs' uncontested facts in their scheduling order in this case.)

38. Just like the Advisory Committee to the Surgeon General and various Surgeon Generals and others, Reynolds has on certain occasions stated its opinion that nicotine is not "addictive" under the classic definition of "addiction" or other meaningful definitions of that term, which attempt to draw distinctions between many common activities such as drinking coffee and classic drugs of abuse. (Reynolds' Answer to Plffs.' First Am. Compl. at ¶ 14.)

39. Reynolds states that the sources from which references are made in regard to smoking addiction ... relative to the Surgeon General's Advisory Committee is the report of the Advisory Committee to the Surgeon General, USDHEW (1964), which states:

In medical and scientific terminology [cigarette smoking] should be labeled *habituation* to distinguish it clearly from *addiction,* since the biological effects of tobacco, like coffee and other caffeine-containing beverages, betel morsel chewing and the like, are not comparable to those products produced by morphine, alcohol, barbiturates, and many other potent addicting drugs. [1964 Report of the Advisory Committee to the Surgeon General, at p. 350 (emphasis in original)].

The tobacco habit should be characterized as an *habituation* rather than an *addiction,* in conformity with accepted World Health Organization definitions, since once established there is little tendency to increase the dose; psychic but not physical dependence is developed; and the detrimental effects are primarily on the individual rather than society. No characteristic abstinence syndrome is developed upon withdrawal. [1964 Report of the Advisory Committee to the Surgeon General, at p. 354 (emphasis in original) ]

(Reynolds' Response to Plffs.' First Set of Interrogatories at No. 6.)

40. In addition, research has shown that people smoke for a variety of reasons, including the "taste" and "feel" of cigarette smoke, the sensory responses in the throat and upper airway, and even the handling of the cigarette itself by the smoker. In addition, the mild pharmacologic effects of nicotine play an important role in smoking behavior for many people. However, the view that the complex nature of smoking behavior can be explained as being a function of nicotine pharmacology alone is an oversimplification. Research has shown that nicotine also has an important role in the sensory effects of smoking. These sensory effects represent a subset of a number of chemosensory properties that affect smoking behavior. Moreover, the smoker's past learned behavioral experiences influence in large measure cigarette smoking behavior (e.g., through number of cigarettes smoked per day, puff number, puff volume, puff duration, puff interval, mouthspill, etc.). Cigarette smoking may also provide certain personal "benefits" which, in turn, contribute to the overall pleasure and enjoyment of smoking. Certain models of smoking behavior indicate that, depending on the person and on the situation,

smoking and/or nicotine may reduce feelings of dysphoria, reduce stress, reduce anxiety and anger, enhance memory, increase vigilance or attention, or increase positive emotional distress. Scientists from Reynolds have conducted internal research and have evaluated the external studies regarding the issue of why people smoke. Reynolds refers Plaintiffs to the following peer-reviewed publication by Reynolds' scientists for further discussion of this issue: Robinson, J.H. and Pritchard, W.S., "The Role of Nicotine in Tobacco Use," *Psychopharmacology* 108(4):397–407 (1992). (Reynolds' Response to Plffs.' First Set of Interrogatories at No. 15.)

41. Reynolds admits that prior to 1960 it, like the public at large, was aware of published scientific research, including epidemiological studies and mouse skin-painting studies, which suggested that cigarette smoking was associated with lung cancer in humans. In response to such studies, by the mid–1950s, Reynolds, among other things, adopted procedures to systematically monitor reasonably available scientific and medical literature regarding the possible relationship between the use of tobacco products and health. In that regard, Reynolds has subscribed to a host of lay, medical and scientific publications and more recently to computerized databases, such as MedLine. These publications contain articles and reports pertaining to smoking and health issues, including lung cancer. In addition, Reynolds states that beginning in 1954 Reynolds has sponsored, funded or conducted extensive scientific research in numerous activities relating in a broad sense to smoking and health issues, including various biomedical and smoking-related research. Based on the scientific and medical literature it has monitored and the research it has sponsored, funded and conducted, Reynolds admits that since at least the mid–1950s it has been aware of medical and scientific research and information relating to smoking and lung cancer, including various conclusions that have resulted from that research and information. (Reynolds' Response to Plffs.' First Set of Requests for Admission of Facts at No. 33.)

42. Based on information and belief, Reynolds did not conduct "research or market study before 1970 to determine the predominate language spoken in Puerto Rico." (Reynolds' Response to Plffs.' First Set of Requests for Admission of Facts at No. 19.)

## III. STANDARD FOR MOTION FOR SUMMARY JUDGMENT

Rule 56(c) of the Federal Rules of Civil Procedure provides for the entry of summary judgment where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Pagano v. Frank,* 983 F.2d 343, 347 (1st Cir.1993); *Lipsett v. University of Puerto Rico,* 864 F.2d 881, 894 (1st Cir.1988). Summary judgment is appropriate where, after drawing all reasonable inferences in favor of the non-moving party, there is no genuine issue of material fact for trial. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is material if, based on

the substantive law at issue, it might affect the outcome of the case. *Id.* at 248, 106 S.Ct. 2505; *Mack v. Great Atl. & Pac. Tea Co., Inc.*, 871 F.2d 179, 181 (1ˢᵗ Cir.1989). A material issue is "genuine" if there is sufficient evidence to permit a reasonable trier of fact to resolve the issue in the non-moving party's favor. *See Anderson*, 477 U.S. at 248, 106 S.Ct. 2505; *Boston Athletic Ass'n v. Sullivan*, 867 F.2d 22, 24 (1ˢᵗ Cir.1989).

The party filing a motion for summary judgment bears the initial burden of proof to show "that there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The burden then shifts to the non-movant to show that "sufficient evidence supporting the claimed factual dispute [exists] to require a jury or judge to resolve the parties' differing versions of truth at trial." *See First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288–89, 88 S.Ct. 1575, 1592–93, 20 L.Ed.2d 569 (1968). The party opposing summary judgment may not rest upon mere allegations or denials of the pleadings, but must affirmatively show, through filing of supporting affidavits or otherwise, that there is a genuine issue for trial. *See id.; see also Goldman v. First Nat'l Bank of Boston*, 985 F.2d 1113, 1116 (1ˢᵗ Cir.1993). On issues where the non-movant bears the ultimate burden of proof, he must present definite, competent evidence to rebut the motion. *See Anderson*, 477 U.S. at 256–57, 106 S.Ct. at 2514–15.

## IV. CONCLUSIONS OF LAW

### A. Conflict Preemption

 The doctrine of conflict preemption prevents state laws from being applied in a fashion that conflicts with, or contra-

dicts, federal statutes. Conflict preemption occurs where "a federal statute implicitly overrides state law either when the scope of a statute indicates that Congress intended federal law to occupy a field exclusively or when state law is in actual conflict with federal law." *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287, 115 S.Ct. 1483, 131 L.Ed.2d 385 (1995). Congress has foreclosed the removal of tobacco products from the market. *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 121, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000); *see also* 7 U.S.C. § 1311(a) (1993 & Supp. I 2001) ("The marketing of tobacco constitutes one of the greatest basic industries of the United States ..."); 15 U.S.C. § 1331 (declaring congressional policy to protect the national economy while informing smokers about the adverse effects of cigarettes).

Therefore, "allowing tort actions against cigarette manufacturers and sellers for the allegedly negligent act of continuing to make and sell cigarettes would interfere with Congress's policy in favor of keeping cigarettes on the market." *Cruz Vargas v. R.J. Reynolds Tobacco Company*, 218 F.Supp.2d 109 (D.Puerto Rico 2002) (Fusté, J.) *citing Insolia v. Philip Morris Inc.*, 128 F.Supp.2d 1220, 1223 (W.D.Wis. 2000).

In a recent case, Judge Fusté, of this Court, reached this very conclusion.[1] In *Cruz Vargas*, the Plaintiffs brought state law negligence and strict liability claims, asserting that Defendant's cigarettes were defectively designed because they allegedly were addictive and caused hypertension and death. *Id.* at 113. The Court found:

Plaintiffs are barred from pursuing a state-law tort claim based exclusively on the theory that Defendant Reynolds

---

1. This case was affirmed by the First Circuit Court of Appeals in *Cruz–Vargas v. R.J. Reyn-* *olds,* 348 F.3d 271 (1ˢᵗ Cir.2003) (Coffin, F.).

manufactured and sold cigarettes. Defendant Reynolds cannot be liable under Puerto Rico law simply because it manufactures and sells cigarettes. Therefore, to the extent that Plaintiffs seek to impose tort liability against Defendant Reynolds merely for manufacturing and selling cigarettes, we find Plaintiffs' claims to be preempted. *Id.* at 118.

Therefore, the Court holds that Defendant cannot be liable for merely manufacturing and marketing cigarettes that have health risks and are allegedly addictive. The Court DISMISSES WITH PREJUDICE Plaintiffs' tort claims brought under Puerto Rico law based on the theory that Defendant was manufacturing and marketing an inherently dangerous product.

## B. Defective Design

### 1. Negligence

Plaintiffs allege that Defendant is negligent and strictly liable because Defendant's product is unreasonably unsafe for consumers. Plaintiffs allege defects in both the design and the warning of Defendant's cigarettes. The Court finds that Plaintiffs have failed to offer evidence that the cigarettes were defectively designed nor any evidence of a feasible alternative.

 Plaintiffs' first claim is for negligent design. In order to establish a claim of negligence, Plaintiffs must establish that "(1) defendant owed a duty to prevent the harm by conforming to a reasonable standard of conduct, (2) defendant breached that duty through a negligent act or omission, and (3) the negligent act or omission caused the plaintiff's harm." *See id.* at 119. Plaintiffs bear the burden of establishing the applicable standard of care, and proving that Defendants acted below that standard. Plaintiffs have not named an expert on cigarette design who could testify that Defendant was negligent in the design of its cigarettes. To the extent that Plaintiffs assert that Defendant was negli-

gent because it made and sold cigarettes that were dangerous and addictive, such claims are foreclosed by the doctrine of conflict preemption, discussed above. In a case involving identical claims, Judge Fusté, of this Court, found that "Plaintiffs have not proffered any evidence regarding the applicable standard of care for designing cigarettes or how Defendant Reynolds purportedly fell below such a standard." *See Cruz–Vargas,* 218 F.Supp.2d at 119. Plaintiffs' negligent design defect claims in the instant case suffer from the same defect and are similarly subject to dismissal with prejudice on summary judgment.

### 2. Strict Liability

Plaintiffs assert that Defendant is strictly liable for failing to warn decedent of the risks and addictive nature of smoking and for defectively designing its cigarettes.

 To establish strict liability for a design defect under Puerto Rico law, Plaintiffs must show that Defendant Reynolds "places a product on the market, knowing that it is to be used without inspection for defects, and it has a defect that causes injuries." *Malavé–Félix v. Volvo Car Corp.,* 946 F.2d 967, 971 (1st Cir.1991). Puerto Rico has generally adopted the Restatement (Second) of Torts § 402A, which provides that "one who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if (a) the seller is engaged in the business of selling such a product, and (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold." Restatement (Second) of Torts § 402A(1) (1963 & Supp. I 2002). However, under Puerto Rico law, the defect in the product does not have to be "unreasonably dangerous to

the user or consumer." *See Cruz Vargas,* 218 F.Supp.2d at 119, *citing Montero Saldaña v. Am. Motors Corp.,* 107 D.P.R. 452, 1978 WL 48845 (1978). Rather, Plaintiffs need only establish that the product is unsafe. *See id.*

California's consumer expectations test governs Plaintiffs' design defect claims. Under this test, "a product may be found defective in design if the plaintiff demonstrates 'that the product failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner.'" *Carballo–Rodríguez v. Clark Equip. Co.,* 147 F.Supp.2d 66, 71–72 (D.Puerto Rico 2001) (explaining that Puerto Rico has adopted the California Supreme Court's formula for establishing strict liability). A plaintiff can demonstrate the defectiveness of a product through circumstantial evidence, and need not resort to expert testimony. *See Cruz Vargas,* 218 F.Supp.2d at 121.

Plaintiffs have not offered sufficient evidence of a design defect to sustain their burden. In fact, the evidence on record is wholly to the contrary. As evidenced by the affidavit of Defendants' expert historian Luis Martínez Fernández, during the lifetime of Decedent "there has been widespread, pervasive common knowledge throughout the twentieth century that cigarette smoking can cause serious, life-shortening diseases, such as lung cancer, emphysema, hypertension and heart disease . . . [and] that cigarette smoking can be habit forming, addictive, and/or very difficult for some to quit." *See* Affidavit of Dr. Martínez at p. 9. Federal courts have taken judicial notice that the health consequences of smoking have been well known to the public since the mid 1960s, and Courts in Puerto Rico have also noted the wide-spread knowledge of the health risks of smoking. *See e.g. Estate of Alicano Ayala v. Philip Morris, Inc.,* 263 F.Supp.2d 311, 317–18 (D.Puerto Rico 2003) ("Courts throughout the United States have declared that the hazards of smoking are 'common knowledge.'"), *Guilbeault v. R.J. Reynolds Tobacco Co.,* 84 F.Supp.2d 263, 273 (D.R.I.2000) ("this Court is satisfied that it can take judicial notice of the community's common knowledge of the general disease-related health risks associated with smoking . . . as of 1964).

The Court finds that Plaintiffs have not submitted evidence indicating that the ordinary consumer in Puerto Rico did not know that cigarettes were addictive and dangerous for smokers when he started smoking in 1960. *See Collazo–Santiago v. Toyota Motor Corp.,* 937 F.Supp. 134, 139 (D.Puerto Rico 1996) (explaining that in order to establish a design defect under the consumer expectation test, a plaintiff must 'produce evidence that the product failed to satisfy ordinary consumer expectations as to safety') *Medina–Muñoz v. R.J. Reynolds Tobacco Co.,* 896 F.2d 5, 8 (1st Cir.1990) ("[s]ummary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations improbable inferences, and unsupported speculation").

Plaintiffs have also failed to produce evidence that there is a safer, feasible alternative design that would have prevented Plaintiffs' injuries. The alleged design defects Plaintiffs attribute to cigarettes focus on inherent characteristics of cigarettes' principal ingredient—tobacco. The suggestions Plaintiffs have offered for safer cigarettes include nicotine-free cigarettes, creating cigarettes whose nicotine levels have not been manipulated, and accurately measuring tar and nicotine levels in cigarettes.

As evidenced by the declaration of Dr. Jeffrey Gentry, Vice President of Product Development in Reynolds' Research and Development Department, "there is no

safe or risk-free cigarette." Declaration of Dr. Gentry at p. 12. "Tobacco and cigarette smoke naturally contain nicotine," and there is no "technical, let alone commercially feasible, means to completely remove nicotine from tobacco and/or design a cigarette that delivers no nicotine to the smoker." *Id.* at 39–40. As for Plaintiffs' claim that Defendant manipulates nicotine, the only evidence on record is the following statement by Dr. Gentry,

Reynolds does not add nicotine to its cigarettes, does not manipulate and has not manipulated nicotine to addict smokers, and does not design its cigarettes to "addict" smokers. In fact, Reynolds implements design technologies that dramatically reduce nicotine below the naturally-occurring level, including an approximately 65% reduction in the nicotine yield in Winston cigarettes over the past 50 years ... Reynolds also does not manipulate smoke pH, "free" nicotine, or use ammonia compounds in the manner or for the purposes alleged by Plaintiffs. As shown by internal studies by Reynolds and by the Massachusetts Department of Public Health, the use of ammonia compounds in commercial cigarettes does not increase mainstream smoke pH. Moreover, Reynold's use of ammonia does not increases nicotine transfer rater (from tobacco to smoke, or from smoke to the smoker), and does not compromise the determination of smoke nicotine using the FTC method.

■■■■ Plaintiffs' claims that Reynolds inaccurately measure tar and nicotine in cigarettes are similarly without merit. Plaintiffs' claims (1) "that the FTC method or measuring 'tar & nicotine' levels underestimated the levels of nicotine delivered" and (2) that Reynolds "[f]ail[ed] to utilize accurate measurements in determining levels of true nicotine yield of 'low tar' cigarettes" are preempted because they conflict with the FTC's regulation of the area.

Defendant only smoked regular Winstons. *See* Deposition of Virginia Prado at p. 22–23. The Decedent never used a low tar cigarette, and never made his brand choice based on lower tar or nicotine levels.

### 3. Failure to Warn

The only "failure to warn" claims before the Court are those before 1969, because this Court dismissed Plaintiffs' claims for failure to warn after 1969 based on federal law covering cigarette warning labels (docket No. 31).

■■■■ Plaintiffs pre–1969 failure to warn claims fail for two reasons. First, Defendant had no duty to warn Decedent because the health hazards and addictive nature of cigarettes were well known. In Puerto Rico, "[t]he duty to warn in general is limited to hazards not commonly known to the relevant public." *Guevara v. Dorsey Laboratories,* 845 F.2d 364, 367 (1st Cir.1988). As explained by the Puerto Rico Supreme Court,

In sum, the analysis of the adequacy of warnings and/or instructions must be made in light of the knowledge or experience of those who may reasonably and foreseeably use a specific product ... [A] manufacturer need not warn or a hazard if the average consumer ordinarily has knowledge of the dangers of the product. *Aponte Rivera v. Sears Roebuck de PR, Inc.,* 145 D.P.R. 245, 1998 WL 324486 (1998).

As previously explained, the health hazards and addictive nature of smoking have long been common knowledge in Puerto Rico, including when Decedent began smoking in 1960.

■■■■ In addition, there is no evidence that Defendant's alleged failure to warn proximately caused the Decedent's injuries. In Puerto Rico, tort plaintiffs have the burden of establishing that the

conduct of the defendant caused their injuries. "Proof of causation is essential." *Muñiz–Núñez v. American Home Products Corp.*, 582 F.Supp. 459, 461 (D.Puerto Rico 1984). The Plaintiff must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a substantial factor in bringing about the result.

In the instant case, there is no evidence that Defendant's failure to warn, before 1969, caused the Plaintiffs' injuries. The evidence is as follows:

(1) Decedent began smoking due to the influence of a female friend, according to the testimony of Mrs. Prado. *See* Deposition of Virginia Prado at pages 14–15, 62–63.

(2) The Decedent was warned on numerous occasions by family and friends of the health risks and addictiveness of smoking. According to the testimony of Mrs. Prado, Mrs. Prado's parents warned him that smoking was a vice and that it was addictive (p. 16), that Mrs. Prado warned him about the hazards of smoking (p. 86), that his children would warn him of the hazards of smoking (Deposition of E. García at pp. 17–18, 20), that his friends told him frequently to stop smoking (Deposition of O. García at pp. 27–29), that his brother told him to stop smoking because it was harmful to his health (Deposition of C. García at p. 8), that his nephew told him "[t]hat smoking kills people" (D. García deposition at p. 17). The Court cites only these few examples, but the list continues.

(3) Decedent ignored these warnings (*See* Deposition of D. García at pp. 11–12). He repeatedly said that he had to "die from something." (See Deposition of O. García at p. 40–41).

(4) Decedent understood the hazards of smoking. He did not want his children or grandchildren to smoke. *See* Deposition of M. García at pp. 70, 73.

Thus, the Decedent began smoking because of the influence of a female friend, he was repeatedly warned of the hazards of smoking, he understood those hazards, he ignored the warnings, and continued to smoke.

Plaintiffs have not provided evidence to the contrary. To the extent that Plaintiffs might claim that the conduct by Defendant that caused the injury was the sale of cigarettes, any such claim is barred by the doctrine of conflict preemption, discussed above.

Therefore, the Court **DISMISSES WITH PREJUDICE** Plaintiffs' claims for design defect.

### 4. Fraud

■ Plaintiffs' fraud claim is premised on the allegation that Defendant, and other entities who are not party to this suit, made affirmative misrepresentations and fraudulently concealed information concerning health hazards and addiction associated with smoking.

■ Under Puerto Rico law, a plaintiff "must establish: (1) that false representation was made; (2) that the plaintiff reasonably and foreseeably relied thereon; (3) that the plaintiff was injured by his reliance; and (4) that the defendant intended to defraud the plaintiff." *Wadsworth, Inc. v. Schwarz–Nin*, 951 F.Supp. 314, 323 (D.Puerto Rico 1996).

■ Furthermore, a plaintiff asserting fraud "must produce evidence which is strong, clear, unchallengeable, convincing, and conclusive, since a mere preponderance of the evidence is not sufficient to establish the existence of fraud in [Puerto

Rico]." *F.C. Imports, Inc. v. First Nat. Bank of Boston, N.A.,* 816 F.Supp. 78, 87 (D.Puerto Rico 1993).

Plaintiffs' fraud claim is without merit because (1) there is no evidence that the Decedent ever heard any allegedly false statements made by Reynolds; (2) there is no evidence that the Decedent relied on any alleged misstatements made by Reynolds in his decision to begin or continue smoking; and (3) even if there were some evidence that Decedent had relied on some allegedly false statement, any such reliance would be unreasonable in light of (a) the long-standing common knowledge of the health risks, including cancer, associated with smoking, (b) the Surgeon General's Warnings that have appeared on all Reynold's cigarette packages since 1966, and (c) the warnings the Decedent himself read regarding the health hazards and addictiveness of smoking.

 In order to prevail on a fraud claim, a plaintiff must establish each and every element with clear and unchallengeable evidence. *See F.C. Imports, Inc.,* 816 F.Supp. at 87. Plaintiffs have not offered any evidence that Defendant made a false statement to the Decedent. In their complaint, Plaintiffs allege that Defendant made fraudulent misrepresentations through advertisements and other statements. However, when questioned in depositions as to this issue, Plaintiffs denied any knowledge of the allegedly false representations. In addition, they testified that they were not aware of the Decedent knowing of these alleged statements. Nor have Plaintiffs provided any evidence that they relied on any of these allegedly false statements when he began smoking. The Plaintiffs testified that Decedent began smoking based on the influence of a friend and that he continued smoking despite knowledge of the risks. Therefore, there is no evidence to support Plaintiffs' fraud claim and the Court **DISMISSES WITH PREJUDICE** all Plaintiffs' fraud claims.

### 5. Article 189 of the Puerto Rico Penal Code

 Plaintiffs have alleged that Defendant's deceptive acts or practices regarding their products, including concealment, suppression, and/or omission of material facts regarding those products, violated Article 189 of the Puerto Rico Penal Code. Plaintiffs allege that Defendant carried out a campaign of fraud, false statements, misrepresentations, and concealment of material information. Plaintiffs allege that Defendant purposefully concealed its actual knowledge concerning the manipulation of the nicotine levels in cigarettes and the hazards of smoking, actively prevented this information from reaching the public, and lied about the dangers of cigarettes, resulting in Decedent being unaware of the hazards of smoking.

Article 189 prohibits the fraudulent change in the "substance, quality or quantity of the thing [to be] deliver[ed] by virtue of an obligation in order to secure an undue profit for himself or a third party."

Plaintiffs' Article 189 claim fails for three reasons. First, to the extent that Plaintiffs are alleging that Reynolds violated Article 189 by selling Winston cigarettes, that claim is precluded by the doctrine of conflict preemption. Second, Plaintiffs have not provided evidence that Defendant fraudulently substituted inferior goods when it manufactured cigarettes allegedly sold to the Decedent. Decedent purchased regular Winston cigarettes and those are the cigarettes that he smoked. As explained previously, all cigarettes have inherent health risks, and any claim that Defendant is liable in tort for manufacturing cigarettes simply because they have health risks is preempted by the doctrine

of conflict preemption. Finally, Plaintiff has failed to provide any evidence that Defendant made or that the Decedent heard any allegedly fraudulent statements made by Defendant. Therefore, the Court **DISMISSES WITH PREJUDICE** Plaintiffs' claim under Article 189 of the Puerto Rico Penal Code.

## V. CONCLUSION

The Court **GRANTS** Defendant's motion for summary judgment (**docket No. 80**) and **DISMISSES WITH PREJUDICE** Plaintiffs' claims against Defendant.

**IT IS SO ORDERED.**