In re METHYL TERTIARY BUTYL ETHER ("MTBE") PRODUCTS LIABILITY LITIGATION.

Master File No. 1:00–1898.
MDL No. 1358(SAS).
No. M21–88.

United States District Court, S.D. New York.

Signed March 5, 2015.

---

54. *Id.* at 503.

55. *Id.* (quoting *Victory Transport, Inc. v. Comisaria General,* 336 F.2d 354 (2d Cir.1964)).

56. *Id.*

Robert J. Gordon, Esq., Robin L. Greenwald, Esq., William A. Walsh, Esq., Weitz & Luxenberg, P.C., New York, NY, for Plaintiffs.

Peter J. Sacripanti, Esq., James A. Pardo, Esq., Stephen J. Riccardulli, Esq., Lisa A. Gerson, Esq., McDermott Will & Emery LLP, New York, NY, for Defendants.

Victor L. Cardenas, Jr., Esq., William J. Jackson, Esq., John D.S. Gilmour, Esq., Jackson Gilmour & Dobbs, P.C., Houston, TX, Carlos A. Del Valle Cruz, Esq., Legal Counsel, San Juan, PR, John K. Dema, Esq., Law Offices of John K. Dema, U.S. Virgin Islands, Orlando H. Martinez, Esq., Orlando H. Martinez Law Offices, San Juan, PR, Michael Axline, Esq., Miller, Axline & Sawyer, Sacramento, CA, for the Commonwealth.

Peter J. Sacripanti, Esq., James A. Pardo, Esq., Stephen J. Riccardulli, Esq., Lisa A. Gerson, Esq., McDermott Will & Emery LLP, New York, NY, for ExxonMobil and Appearing on Behalf of All Moving Defendants.

William J. Stack, Esq., Carlos M. Bollar, Esq., Archer & Greiner, P.C., Haddonfield, NJ, for ExxonMobil.

Steven L. Leifer, Esq., Baker Botts, L.L.P., Washington, DC, for HOVIC and HOVENSA.

## CORRECTED OPINION AND ORDER

SHIRA A. SCHEINDLIN, District Judge:

## I. INTRODUCTION

This is a consolidated multi-district litigation ("MDL") relating to contamination—actual or threatened—of groundwater from various defendants' use of the gasoline additive methyl tertiary butyl ether ("MTBE") and/or tertiary butyl alcohol, a product formed by the breakdown of MTBE in water. In this case, the Commonwealth of Puerto Rico (the "Commonwealth") alleges that defendants' use and handling of MTBE has contaminated, or threatened to contaminate groundwater within its jurisdiction. Familiarity with the underlying facts is presumed for the purposes of this Order.

Currently before the court is a two-pronged motion for summary judgment premised on the Commonwealth's alleged failure to trace certain defendants' gasoline to the trial sites at which those defendants are allegedly liable.[1] *First,* Certain Defendants move for partial judgment on the Commonwealth's claims for negligence and strict liability at specific trial sites at issue in this phase of the action.[2] *Second,* defendants affiliated with Chevron (the "Chevron Defendants") move for full judgment on all of the Commonwealth's claims.[3] For the following reasons, the motion for summary judgment is GRANTED in part and DENIED in part.

---

**1.** *See* Case Management Order No. 117 (the "Trial Site Matrix"), Dkt. 457 (charting the claims asserted against each defendant at each trial site at issue).

**2.** For a list of the defendants moving for partial summary judgment, *see* Ex. A to the Memorandum of Law in Support of Certain Defendants' Motion for Summary Judgment for Lack of Causation ("Def. Mem."). I will refer to these movants collectively as "Certain Defendants." Separately, in support of the motion for partial summary judgment, some of the Certain Defendants have filed two motions to strike, which I address and decide in connection with my discussion of the partial summary judgment motion. Defendants Shell Oil Company, Shell International Petroleum Company Limited, and Shell Western Supply and Trading Limited (collectively, the "Shell Defendants") join in the motion for partial summary judgment on the ground that the Commonwealth has not traced MTBE from the Shell Defendants to any trial site. However, the facts relevant to the Shell Defendants are set forth in their separate motion for summary judgment on all claims asserted against them. *See* Dkt. 467. I will, if necessary, address causation as it relates to the Shell Defendants when I rule on their separate summary judgment motion.

**3.** For a list of all of the Chevron Defendants, *see* Def. Mem. at n. 3.

## II.  BACKGROUND [4]

The first phase of this action requires the Court to determine the liability of a number of defendants at five different trial sites.[5]  The instant summary judgment motion relies on defendant-specific facts at each trial site in attempting to disprove, as a matter of law, the causal connections the Commonwealth must prove to support certain of its claims.  In this section, I will review the facts underlying the motion for each defendant seeking judgment.[6]

### A.  Gasoline Supply Chain in Puerto Rico

A brief note on the general workings of the gasoline supply chain in Puerto Rico is helpful to contextualizing the defendant-specific facts relevant to the instant motion.  For the most part, gasoline in the Commonwealth is segregated, not commingled.[7]  Therefore, during certain time periods, with limited exceptions, gasoline service station retailers obtained their gasoline supply from a particular, readily-identifiable supplier.[8]  While the records maintained by the moving defendants with regard to tracing gasoline—from manufacturers to traders to wholesalers to retail stations—are relatively sparse for transac-

tions pre-dating 1995 and incomplete even for more recent years, it is generally clear that "two [groups of] manufacturers of gasoline to the island dominated their supply chain during their respective eras." [9]  From 1982 through the mid 1990s, Chevron Phillips Chemical Puerto Rico Core LLC ("CORE") and Conoco Phillips Company ("COP") (collectively, the "Core Defendants") combined to serve as the primary supplier to the island.[10]  From 1995 to 2005, Hess Oil Virgin Islands Corporation ("HOVIC") and HOVENSA LLC ("HOVENSA") combined to serve as the primary supplier.[11]  Defendants dispute the extent of both groups' influence on the supply chain.  I turn now to the facts regarding each of the Certain Defendants' alleged supply of gasoline to the trial sites at issue.

### 1.  Exxon Mobil Corporation

One of the Certain Defendants moving for partial summary judgment on the Commonwealth's strict liability and negligence claims is Exxon Mobil Corporation ("ExxonMobil").  The Commonwealth brings claims against ExxonMobil at the two Esso Standard Oil Company ("Esso") trial sites, Esso CO-364 ("Trial Site No.

---

4.  The facts recited below are drawn from the pleadings, the parties' Local Civil Rule 56.1 Statements, the declarations submitted in connection with this motion, and the exhibits attached thereto.  These facts are undisputed unless otherwise noted.  Where disputed, the facts are viewed in the light most favorable to the nonmoving party.  *See Beard v. Banks,* 548 U.S. 521, 529–30, 126 S.Ct. 2572, 165 L.Ed.2d 697 (2006).

5.  *See* Trial Site Matrix.

6.  The voluminous Rule 56.1 submissions, which are chock-full of disputed facts and statistics, are difficult to distill into one section of an opinion.  This section therefore provides an overview of the most pertinent facts, not a comprehensive summary of all of the facts.  As the Court has repeatedly cau-

tioned the parties to this MDL, summary judgment is only available when there are no genuine disputed issues of material fact.

7.  *See* Plaintiff's Rule 56.1 Statement in Opposition to Certain Defendants' Motion for Summary Judgment for Lack of Causation ("Pl. 56.1") ¶ 20.

8.  *See, e.g., id.* ¶¶ 20, 64.

9.  Plaintiff's Memorandum of Law in Opposition to Certain Defendants' Motion for Summary Judgment for Lack of Causation ("Pl. Mem.") at 8.

10.  *See id.*

11.  *See id.*

5") and Esso CO–242 ("Trial Site No. 6"), to which the Commonwealth contends that it can trace both ExxonMobil's neat MTBE and MTBE gasoline.

The parties do not dispute that, since 1979, ExxonMobil has had very limited contacts with Puerto Rico.[12] For instance, it has never owned, operated, or leased any gasoline service station in Puerto Rico, including the Esso trial sites.[13] In the past thirty-five years, ExxonMobil has supplied only thirteen shipments of gasoline to Puerto Rico, and it has never transported or delivered gasoline to any *service stations* within Puerto Rico, including the Esso trial sites.[14] The presence of MTBE was confirmed in a lone April 1995 shipment of gasoline containing six percent MTBE by volume to the Catano Puerto Rican terminal.[15] The Commonwealth has provided no evidence demonstrating that this lone shipment was linked to the delivery of gasoline at either of the Esso trial sites.[16]

These limited contacts extend to transactions related to the sale of neat MTBE. From 1982 to 1985, Exxon Chemical International Supply, S.A. ("ECIS"), an independent Panamanian corporation, sold limited amounts of neat MTBE to the Core Defendants, which they then shipped to their facility in Puerto Rico.[17] Shortly thereafter, ECIS was dissolved.[18] ECIS was not the only company that sold neat MTBE to the Core Defendants' Puerto Rico facility during that three-year span.[19]

The Commonwealth also points to a 1982 exchange agreement (the "Exchange Agreement") between Esso and Phillips 66 Company ("Phillips") as potential evidence of ExxonMobil's liability.[20] Pursuant to the Exchange Agreement, Phillips agreed to deliver product to Esso in Guayama, Puerto Rico, and in return, Esso agreed to provide equal volumes of gasoline to Phillips in Baytown, Texas.[21] ExxonMobil was not a direct party to the Exchange Agreement, nor to its subsequent amendments.[22] There is no document before the Court indicating that ExxonMobil paid for the gasoline supplied to Esso under that Agreement. However, Esso did enter into a separate sales contract in 1982 with ExxonMobil, whereby Esso purchased gasoline from ExxonMobil and that gasoline was delivered to COP in the mainland United States.[23] ExxonMobil states that Esso drew up this separate sales agreement so that it could meet *its* obligations under the

**12.** *See* Def. Mem. at 7.

**13.** *See* Rule 56.1 Statement in Support of Certain Defendants' Motion for Summary Judgment for Lack of Causation ("Def. 56.1") ¶ 10.

**14.** *See id.* ¶¶ 13, 17.

**15.** *See id.* ¶ 19.

**16.** *See id.* ¶¶ 19–21.

**17.** *See id.* ¶ 15.

**18.** *See id.*

**19.** *See id.* ¶ 16.

**20.** *See* Exxon Mobil Corporation's Memorandum of Law in Support of Motion to Strike Plaintiffs' New Theory of Liability in Opposition to Defendants' Motion for Summary Judgment for Lack of Causation ("Def. ExxonMobil MTS Mem.").

**21.** *See* Exchange Agreement, Ex. A to 11/26/14 Reply Declaration of Lisa A. Gerson, counsel for ExxonMobil, in Support of Certain Defendants' Motion for Summary Judgment for Lack of Causation ("Gerson Reply Decl.").

**22.** *See id.*

**23.** *See* Reply Memorandum in Further Support of Certain Defendants' Motion for Summary Judgment for Lack of Causation ("Reply Mem.") at 3–4.

Exchange Agreement, to which ExxonMobil was not a party.[24]

## 2. Core Defendants

The Core Defendants also seek partial summary judgment at the Esso trial sites, as well as at the Shell ("Trial Site No. 3") and Total ("Trial Site No. 9") trial sites. As noted above, from 1982 through the mid 1990s, the Core Defendants served as the primary supplier of MTBE gasoline to Puerto Rico. According to one of the Commonwealth's experts, all of the gasoline manufactured by the Core Defendants during the time period from 1982 to 1994 contained some volume of MTBE.[25] The Core Defendants discontinued blending MTBE with gasoline in March 2000, but their records reflect that MTBE was present in its distribution system and in at least some of its finished gasoline until at least the end of May 2000.[26]

From 1982 to 2000, the Core Defendants sold over 115 million barrels of gasoline—close to five billion gallons—to customers on the island of Puerto Rico.[27] For ten years, from 1982 to 1992, they were the primary supplier of gasoline to Esso, providing Esso with more than a billion gallons.[28] Esso also received gasoline from another supplier, Arochem, in 1990 and 1991, though in vastly smaller quantities.[29] While it was standard practice for the Core Defendants to use MTBE in their gasoline, there is no evidence that Arochem's gasoline contained MTBE.[30] As a general matter, Esso purchased only enough gasoline from its suppliers to supply the Esso retail outlets in Puerto Rico—roughly 95 to 98 percent of Esso's sales of gasoline went to its branded stations.[31]

A similar set of facts and allegations govern the Core Defendants' sale of gasoline to USA Petroleum Corporation ("USA") and Idemitsu Apollo Corporation ("IAC").[32] USA, a California corporation, formed Gasolina de Puerto Rico ("GPR") in the 1970s.[33] In 1992, IAC purchased GPR's stock from USA, and GPR was renamed Total Petroleum Puerto Rico Corp. ("Total").[34]

While the Core Defendants dispute whether they could be classified as a "primary" supplier to USA and IAC, it is undisputed that from 1985 to 1992, the Core Defendants supplied a significant amount of gasoline to USA, just as they did to IAC from 1992 until at least 1997.[35] These companies, like Esso, also received much smaller amounts of gasoline from another supplier, namely Puerto Rico Sun Oil Company, which may or may not have added MTBE to its gasoline.[36] The gasoline the Core Defendants sold to USA and

---

24. *See id.*

25. *See* Pl. 56.1 ¶ 17. Defendants do not dispute the expert opinion as stated, but attack the assumption on which it rests as being unsupported by direct evidence.

26. *See id.* ¶ 10.

27. *See id.* ¶ 18. Because the parties dispute the exact totals, the figures recited above reflect the minimums conceded by defendants. Defendants also dispute that all of that gasoline contained MTBE.

28. *See id.* ¶¶ 21–22.

29. *See id.* ¶ 24.

30. *See id.* ¶ 25.

31. *See id.* ¶ 61.

32. *See id.* ¶¶ 29–36.

33. *See id.* ¶ 75.

34. *See id.* ¶¶ 74, 76.

35. *See id.* ¶ 30.

36. *See id.* ¶ 31–34.

IAC ultimately reached at least some of the GPR stations.[37]

Lastly, the Core Defendants supplied over thirteen million barrels of gasoline to the Shell Company (PR) Ltd. ("SCPRL") from 1983 to 1995.[38] According to the Commonwealth's expert, all of the gasoline the Core Defendants sold to SCRPL contained MTBE. Most, if not all, of the Core Defendants' gasoline SCRPL received was delivered to the Catano Puerto Rican terminal.[39] And, according to SCRPL, almost all of the gasoline supplied to the Shell trial site, Trial Site No. 3, was transported and delivered by Camioneros Cooperativa de Transporte de Carga from the Catano terminal.[40]

### 3. HOVIC/HOVENSA Defendants

HOVIC and HOVENSA move for partial summary judgment on the Commonwealth's negligence and strict liability claims asserted against them at the Shell and Texaco ("Trial Site No. 10") trial sites, as well as one of the two Esso trial sites (Trial Site No. 6).[41] I turn next to the facts relevant to HOVIC and HOVENSA's supply of gasoline to these trial sites.[42]

HOVIC owned the St. Croix refinery until October 1998, at which time ownership was transferred to HOVENSA.[43] Defendants do not dispute that HOVIC first shipped gasoline containing MTBE to Puerto Rico in November 1994, and HOVENSA last shipped gasoline containing MTBE to Puerto Rico in February 2005.[44] According to Esso's experts, from 1997 to 2008, HOVIC and HOVENSA accounted for eighty-three percent of all of Esso's gasoline supply.[45] These experts also

37. *See id.* ¶ 82. The Core Defendants contest the Commonwealth's allegation that IAC supplied gasoline directly to GPR's *retail stations,* acknowledging only that IAC sold gasoline to GPR generally. *See* Defendants' Response to Plaintiff's Rule 56.1 Statement in Opposition to Certain Defendants' Motion for Summary Judgment for Lack of Causation ("Def. Reply 56.1") ¶ 82. The Core Defendants also refute any implication that their gasoline specifically reached Trial Site No. 9. *See id.*

38. *See* Def. Reply 56.1 ¶ 37. As with USA, IAC, and Esso, the Core Defendants were not the only suppliers to SCRPL, but they were the largest suppliers.

39. *See id.* ¶ 39.

40. *See id.* ¶ 95.

41. It bears mentioning that HOVIC and HOVENSA do not move for partial summary judgment for lack of causation as to the other Esso trial site (Trial Site No. 5).

42. In support of its opposition, the Commonwealth provides charts summarizing data reflecting (1) the annual distribution of gasoline on the island of Puerto Rico by majors drawn from a report of the Department of Consumer Affairs (the "DACO Report") and (2) data reflecting the annual supply of gasoline to majors by HOVIC and HOVENSA. *See* Ex. 1 to 11/7/14 Declaration of Nathan P. Short, counsel to the Commonwealth, in Support of Plaintiff's Opposition to Certain Defendants' Motion for Summary Judgment for Lack of Causation ("Summary Charts") ("Short Decl."). Included in the charts is a comparison of these two data sets, providing the percentage that HOVIC and HOVENSA's supply bears to the annual distributions of gasoline on the island by the majors. HOVIC and HOVENSA vigorously dispute the relevance and admissibility of those charts in a separate motion to strike. *See* Defendants Hess Oil Virgin Island Corp.'s and Hovensa L.L.C.'s Memorandum of Law in Support of Motion to Strike Plaintiffs' Exhibit 1 Attached to Nathan Short's Declaration ("HOVIC/HOVENSA MTS·Mem."). The Short Declaration was so contested that the parties have burdened the Court not only with extensive briefing, but also *four* separate post-briefing letters squabbling over new arguments raised in HOVIC and HOVENSA's reply brief.

43. *See* Pl. 56.1 ¶ 44.

44. *See id.* ¶¶ 43, 45.

45. *See id.* ¶ 49.

state that Esso received smaller volumes of gasoline from other suppliers, but that none of these suppliers used MTBE in gasoline after 1992.[46] As noted above, Esso generally purchased only enough gasoline from its suppliers to supply the Esso-branded retail stations, such that almost all of Esso's sales of gasoline went to these stations.

The Commonwealth separately points to the Summary Charts as proof that HOVIC and HOVENSA supplied massive quantities of gasoline containing MTBE to SCPRL and Shell Western, as well as to Texaco Puerto Rico Inc. ("Texaco"), which were delivered to the Shell and Texaco trial sites, respectively. With respect to SCRPL and Shell Western, the Commonwealth's Summary Charts display HOVIC and HOVENSA supplying nearly 440 million gallons of gasoline containing MTBE from 1995 to 2004.[47] As discussed above, the Commonwealth's expert traces this gasoline to the Catano terminal and, by extension, Trial Site No. 3. Additionally, the Summary Charts reflect HOVIC and HOVENSA supplying nearly 525 million gallons of gasoline containing MTBE to Texaco from 1995 to 2005, accounting for nearly all of Texaco's gasoline supply from 1998 to 1999 and from 2002 to 2005.[48] Texaco's gasoline was delivered to the Texaco trial site in Texaco-owned tanker-trailers driven by contractors' trucks.[49]

## B. History of Leaking Underground Storage Tanks at the Trial Sites During the Relevant Supply Periods

Each of the trial sites had underground storage tanks ("USTs"), which housed the gasoline supplied to that trial site. In this section, I review the facts regarding the USTs at each trial site for the relevant supply periods.

### 1. Trial Site No. 6

According to Marcel Moreau, a Commonwealth expert, Trial Site No. 6, one of the two trial sites at issue operated by Esso, has had a long history of releases and contamination throughout the 1980s and 1990s, with low level leaks continuing to the present.[50] Two of the USTs at this trial site were in operation for over forty years before being replaced in 1994 and, in the expert's view, leaked continuously before 1994.[51] Further contamination readings from 2012 "indicate residual leaking from the new tank system after 1994, particularly implicating top fittings, fill pipe, submersible turbine pump and adjacent piping." [52] Historical MTBE levels at the trial site allegedly stemming from the leaking USTs are not known with any degree of precision because Esso refused to sample for MTBE until 2004, at which point MTBE was detected.[53]

### 2. Trial Site No. 5

As with Trial Site No. 6, Moreau documents a history of leaking USTs at Esso's Trial Site No. 5, potentially resulting in ongoing MTBE contamination at the site from the 1990s to today.[54] For instance, in

46. *See id.* ¶ 51.

47. *See id.* ¶ 53.

48. *See id.* ¶¶ 57, 59.

49. *See id.* ¶ 111.

50. *See id.* ¶ 67.

51. *See id.*

52. Pl. Mem. at 18.

53. *See id.* at 19.

54. *See* Pl. 56.1 ¶ 72.

1991, an Esso witness confirmed that soil contamination at the site was discovered during the replacement of the site's USTs, indicating potential releases from the UST system.[55] Then in 1998, there was a ninety gallon spill during a UST and piping removal and replacement process.[56] An Esso witness even acknowledged that the contamination discovered in the 1990s was likely attributable to leaking USTs.[57] In 2007, soil samples revealed the presence of MTBE.[58]

### 3. Trial Site No. 9

Moreau also points to a history of releases and contamination at Total's Trial Site No. 9 over the life of the facility. For instance, in 1992, the installation of groundwater monitoring wells revealed significant soil contamination which, according to Moreau, likely resulted from faulty piping and tank top fitting of the five USTs on site.[59] Accordingly, Moreau believes that there were likely multiple releases from these components that occurred intermittently since the USTs first began operations in 1978.[60] In 1997, a corrosion evaluation revealed further leaking USTs.[61] From 2001 to late 2003, contaminants were observed in all five on-site groundwater monitoring wells—the Commonwealth's expert attributes this contamination to releases from two spill containment manholes on the premium tanks,

which would have been intermittent and associated with fuel deliveries.[62] Additional contamination was detected in monitoring wells in 2004.[63] At that time, MTBE was finally sampled—and detected—in the groundwater.[64]

### 4. Trial Site No. 3

A history of gasoline releases at Shell's Trial Site No. 3 dates back to at least July 1988, when a safety audit uncovered gasoline leaking from gaps in the pavement close to the gas pump islands.[65] In 1991, a contractor responded to a leak detector alarm and, though finding no conclusive evidence of a release, advised continued monthly monitoring.[66] And, in 2001, after UST removal, significant contamination was detected in soil and rainwater samples. Additional contamination was present in soil samples in 2002 and 2003.[67] In 2005, MTBE was detected in a groundwater sample.[68]

### 5. Trial Site No. 10

According to Moreau, Texaco used "inferior methods of leak detection on its aging bare steel UST systems [at Trial Site No. 10] in the 1980s and 1990s."[69] Ultimately, when the USTs were removed in 2006, and soil contamination was identified, Texaco acknowledged that a release occurred.[70] MTBE was first detected in October 2009

55. See id.

56. See id.

57. See Pl. Mem. at 20.

58. See Pl. 56.1 ¶ 72.

59. See id. ¶ 87.

60. See id.

61. See id. ¶ 88.

62. See id. ¶¶ 89–90.

63. See id. ¶ 91.

64. See id. ¶¶ 92–93.

65. See id. ¶ 101.

66. See id. ¶ 102.

67. See id. ¶¶ 104–105.

68. See id. ¶ 106.

69. Id. ¶ 112. Defendants dispute this characterization.

70. See id. ¶ 113.

upon the installation of monitoring wells, and it was detected again in 2010.[71]

## C. Chevron Defendants

The Chevron Defendants move for summary judgment on all claims against them due to lack of causation on various grounds. They allege that (1) there is no evidence that they refined, marketed, or supplied gasoline or products containing MTBE in Puerto Rico, (2) there is no evidence that they owned or operated gasoline service stations or USTs in Puerto Rico that discharged gasoline containing MTBE, (3) they are not successors-in-interest to non-party refinery owners, and (4) there is no evidence that they caused the Commonwealth any injuries.

The key factual inquiry relevant to the Chevron Defendants' motion is whether they are successors-in-interest to, or otherwise managed, the Bayamon Refinery in Puerto Rico. Among several documents the Commonwealth offers to support such a finding is a report from the United States Environmental Protection Agency ("EPA"), which, according to the Commonwealth, implicates Chevron Corporation and Chevron USA in operating, owning, or controlling the Bayamon Refinery.[72] Specifically, in describing the Bayamon Refinery, the EPA report lists "Chevron Corporation" under a column entitled "Other (Former) Names of the Site." [73] The Commonwealth also relies on a 1985 press clipping in which Chevron Corporation announced that it was seeking bids for its gasoline business in Puerto Rico, including for the Bayamon Refinery.[74] Finally, the Commonwealth cites a District of Puerto Rico court opinion from 1991 in a wrongful termination case involving a former Chevron employee as further evidence of the Chevron Defendants' control over operations in Puerto Rico.[75] The opinion states that "in April 1984, Chevron Corporation assumed control of Gulf operations worldwide, including those in Puerto Rico." [76]

The Chevron Defendants dismiss the Commonwealth's evidence as irrelevant and inadmissible, insisting that they did not own or operate the Bayamon Refinery.[77] Instead, they state that the Bayamon Refinery was owned by the Caribbean Gulf Refining Corporation, which was merely an indirect subsidiary of Chevron Corporation.[78]

## III. LEGAL STANDARD

Summary judgment is appropriate "only where, construing all the evidence in the light most favorable to the non-movant and drawing all reasonable inferences in that party's favor, there is 'no genuine issue as to any material fact and ... the movant is entitled to judgment as a matter of law.'" [79] "A fact is material if it might

---

71. *See id.* ¶ 114.

72. *See* Plaintiff's Response to Rule 56.1 Statement in Support of Certain Defendants' Motion for Summary Judgment for Lack of Causation ("Pl. Reply 56.1") ¶¶ 61, 65–66, 69.

73. *Id.* ¶ 65.

74. *See id;* Press Clipping, Ex. 2 to 11/7/14 Declaration of Dave E. Blum, counsel for Commonwealth, in Support of Plaintiff's Opposition to Certain Defendants' Motion for Summary Judgment for Lack of Causation ("Blum Decl.").

75. *See* Pl. 56.1 ¶ 69; *Marti v. Chevron U.S.A. Inc. et al.,* 772 F.Supp. 700 (D.P.R.1991).

76. *Marti,* 772 F.Supp. at 702.

77. *See* Def. Mem. at 15–17.

78. *See id.* at 16.

79. *Rivera v. Rochester Genesee Reg'l Transp. Auth.,* 743 F.3d 11, 19 (2d Cir.2014) (quoting Fed.R.Civ.P. 56(c)) (some quotation marks omitted).

affect the outcome of the suit under the governing law, and an issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." [80]

"[T]he moving party has the burden of showing that no genuine issue of material fact exists and that the undisputed facts entitle [it] to judgment as a matter of law." [81] To defeat a motion for summary judgment, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts," [82] and "may not rely on conclusory allegations or unsubstantiated speculation." [83]

■■■ In deciding a motion for summary judgment, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." [84] " 'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.' " [85]

## IV.  APPLICABLE LAW

■■■ Causation is a necessary element of the Commonwealth's strict product liability and negligence claims. [86] Plaintiff has the burden of proving causation by a preponderance of the evidence. [87] Under Puerto Rico law, to prove causation, the "Plaintiff must introduce evidence which affords a reasonable basis for the conclusion that it is *more likely than not* that the conduct of the defendant was a *substantial factor* in bringing about the result." [88] This burden can be met with circumstantial evidence. [89]

Significantly, in *City of New York v. ExxonMobil Corporation,* a related MTBE proceeding in this MDL, I denied defendants' motion for judgment as a matter of law in refusing to overturn a jury verdict that relied on circumstantial evidence to identify manufacturer defendants responsi-

**80.** *Windsor v. United States,* 699 F.3d 169, 192 (2d Cir.2012), *aff'd,* — U.S. ——, 133 S.Ct. 2675, 186 L.Ed.2d 808 (2013) (quotations and alterations omitted).

**81.** *Coollick v. Hughes,* 699 F.3d 211, 219 (2d Cir.2012) (citations omitted).

**82.** *Brown v. Eli Lilly & Co.,* 654 F.3d 347, 358 (2d Cir.2011) (quotation marks and citations omitted).

**83.** *Id.* (quotation marks and citations omitted).

**84.** *Cuff ex rel. B.C. v. Valley Cent. Sch. Dist.,* 677 F.3d 109, 119 (2d Cir.2012).

**85.** *Barrows v. Seneca Foods Corp.,* 512 Fed. Appx. 115, 117 (2d Cir.2013) (quoting *Redd v. New York Div. of Parole,* 678 F.3d 166, 174 (2d Cir.2012)).

**86.** *See, e.g., In re MTBE,* 591 F.Supp.2d 259, 266 (S.D.N.Y.2008).

**87.** *See id.* The Commonwealth has stated that it will rely only on traditional causation, not on a commingled products theory, to trace defendants' gasoline directly to a station at issue. *See* Def. 56.1 ¶ 2. Ultimately, this requires the Commonwealth to show that defendants' MTBE gasoline was present at the stations at issue when releases occurred. *See In re MTBE ("City of Fresno"),* 980 F.Supp.2d 425, 457 (S.D.N.Y.2013).

**88.** *Prado Alvarez v. R.J. Reynolds Tobacco Co.,* 313 F.Supp.2d 61, 76 (D.P.R.2004) (emphasis added).

**89.** *See Perez–Trujillo v. Volvo Car Corp.,* 137 F.3d 50, 55 n. 10 (1st Cir.1998) (noting that "strict liability claimants may resort to an array of circumstantial evidence"); *Zambrana v. Hospital Santo Asilo de Damas,* 109 D.P.R. 517, 525, 9 P.R. Offic. Trans. 687 (1980) (stating that "the law does not require that a fact be proved with mathematical accuracy, and that circumstantial evidence is intrinsically the same as direct evidence").

ble for MTBE contamination.[90] There, New York law, like Puerto Rico law here, required plaintiff to show that the conduct of the manufacturer or supplier or seller was a *substantial factor* in causing plaintiff's injuries.[91]

By contrast, in *City of Fresno v. Chevron USA*, another related MTBE proceeding in this MDL, defendants prevailed on a causation motion similar to the one brought here where plaintiff, unable to rely on a commingled products theory, provided only vague evidence of gasoline deliveries post-dating reported discharges at the service stations at issue.[92] In *City of Fresno*, plaintiff also relied on Moreau to opine on UST leaks and MTBE releases, and I noted that his general testimony that "spills or leaks occurred on a regular basis" was, *"[w]ithout more,"* insufficient to defeat summary judgment.[93]

## V. DISCUSSION

### A. No Genuine Issue of Material Fact Precludes Judgment in Favor of ExxonMobil on Claims of Negligence and Strict Liability

■ ExxonMobil's liability hinges on whether ExxonMobil was a party to the Exchange Agreement such that the gasoline supplied in Puerto Rico by the Core Defendants to Esso "should be attributed as being supplied" to ExxonMobil.[94] This is because no reasonable jury could assign liability to ExxonMobil on the basis of limited neat MTBE sales by a separate Exxon entity to the Core Defendants, or on account of a lone shipment of gasoline to a terminal from which gasoline was distributed to hundreds of service stations.[95]

ExxonMobil moves to strike the Commonwealth's supposed "new theory of liability"—that ExxonMobil was a party to the Exchange Agreement and is therefore liable for the gasoline the Core Defendants supplied to Esso—on the grounds that the Commonwealth's contention interrogatories were insufficient to put ExxonMobil on notice of this theory, and that the theory was disclosed too late.[96] The Commonwealth opposes the motion to strike by noting, correctly, that the Exchange Agreement argument is not in and of itself a novel theory of liability—the Exchange Agreement is merely a piece of evidence bearing on whether, as the Commonwealth has alleged all along, ExxonMobil supplied MTBE gasoline to the Esso trial sites.[97] However, the Commonwealth devotes the bulk of its motion to strike opposition to dredging up old discovery disputes.[98] While this discussion tends to show that ExxonMobil should have known for quite some time that the Commonwealth intended to pursue an Exchange Agreement-related theory, it also exposes the weak foundation on which the Commonwealth's

90. *See* 739 F.Supp.2d 576, 588 (S.D.N.Y. 2010), *aff'd*, 725 F.3d 65 (2d Cir.2013).

91. *See id.*

92. *See* 980 F.Supp.2d at 458.

93. *Id.* at 460 (emphasis added).

94. *See* Pl. Mem. at 10.

95. *See City of Fresno*, 980 F.Supp.2d at 458. The Commonwealth does not seriously contest this proposition. *See* Pl. Mem. at 10–11.

96. *See generally* Def. ExxonMobil MTS Mem.

97. *See* Memorandum of Law in Opposition to Exxon Mobil Corporation's Motion to Strike Plaintiff's Evidence in Opposition to Defendants' Motion for Summary Judgment for Lack of Causation ("Pl. ExxonMobil MTS Mem.") at 8.

98. *See generally id.*

characterization of the Exchange Agreement rests.

At bottom, the evidence in the record does not present a genuine issue of fact over whether ExxonMobil was a party to the Exchange Agreement. The relevant documents show that the parties to the Exchange Agreement were Esso and Phillips, not ExxonMobil, and that the separate sales agreement between Esso and ExxonMobil entailed delivering gasoline to Phillips on the mainland, not in Puerto Rico. Based on these undisputed facts, the Commonwealth offers only speculation that the Exchange Agreement and separate sales agreement combined to place ExxonMobil "within the chain of supply of [the Core Defendants'] MTBE gasoline to Esso." [99] That speculation, unmoored from the record before the Court, is insufficient to withstand the summary judgment motion as it relates to ExxonMobil.[100] Therefore, summary judgment is granted to ExxonMobil on the Commonwealth's negligence and strict liability claims.[101]

## B. Genuine Issues of Material Fact Preclude Judgment for the Core Defendants and HOVIC and HOVENSA

■ Whether the Core Defendants and HOVIC and HOVENSA are liable for the Commonwealth's negligence and strict liability claims, however, present issues for a jury to resolve because the factual underpinnings of the causation inquiry are heavily disputed. In resolving those disputes of fact in the Commonwealth's favor, a rational jury could find by a preponderance of the evidence that these defendants' MTBE gasoline is directly traceable to the trial sites at issue.

This is a close call because the Commonwealth's product tracing theory depends on a jury connecting many pieces of circumstantial evidence to find the Core Defendants and HOVIC and HOVENSA liable at the trial sites where they are alleged to have contributed to MTBE contamination. I am mindful of my opinion in *City of Fresno*, which signaled to MTBE plaintiffs that speculative arguments lacking substantial factual support cannot survive summary judgment motions for lack of causation in this MDL. But there is just enough factual support in this case—more than in *City of Fresno*—for the Commonwealth to defeat a pre-trial motion for lack of causation as to the Core Defendants and HOVIC and HOVENSA. This is especially true in light of Puerto Rico law, under which causation is satisfied as long as there is a "reasonable basis [to conclude] that it is more likely than not that the conduct of the defendant was a substantial

---

99. Pl. Mem. at 11. As ExxonMobil accurately observes, the case the Commonwealth relies on to support its supply chain theory is inapposite. In *Hasbrouck v. Texaco, Inc.*, 663 F.2d 930, 933 (9th Cir.1981), the court examined whether defendants' sales occurred "in commerce," as that term is used in the Robinson–Patman Act. Putting aside the fact that the instant motion has nothing to do with antitrust, the sales agreement to which ExxonMobil was a party, unlike the underlying agreement in *Hasbrouck*, was not an exchange agreement, and it did not cover the gasoline involved in this case. *See* Reply Mem. at 4 n. 4.

100. *See Brown*, 654 F.3d at 358 ("Where the moving party demonstrates the absence of a genuine issue of material fact, the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact.") (citations and quotations omitted).

101. Because the Commonwealth's theory that ExxonMobil could be held liable via the Exchange Agreement was neither novel nor unfairly surprising, ExxonMobil's motion to strike is denied.

factor in bringing about the result." [102]

Unlike in *City of Fresno*, where the evidence concerning MTBE supply related to deliveries that occurred almost definitively *after* reported discharges at the service stations at issue, there is considerable evidence here that MTBE gasoline attributable to the Core Defendants and HOVIC and HOVENSA reached the trial sites *before* and *contemporaneously with* documented releases of gasoline due to UST leaks.[103] This evidence is bolstered by the nature of the gasoline supply system in Puerto Rico, where major suppliers were readily identifiable by name and time period.[104]

For instance, at Trial Site No. 6, there is evidence that substantial releases occurred throughout the 1980s and into 1990, both during and after the Core Defendants' reign as a substantial—if not overwhelmingly dominant—supplier of gasoline to the island of Puerto Rico. 2012 contamination readings indicate possible residual leaks during the time period that HOVIC and HOVENSA supplied gasoline to the island. Similar evidence regarding potential leaks throughout the 1990s at Trial Site Nos. 5 and 9 overlaps with the Core Defendants' supply of gasoline to Puerto Rico. At Trial

Site No. 3, gasoline releases dated as far back as 1988, when the Core Defendants supplied gasoline to the island, and quite possibly continued through HOVIC and HOVENSA's period of supply, with extensive contamination detected in 2001 after UST removal. And at Trial Site No. 10, contamination detection coinciding with the 2006 removal of USTs, just one year after the end of the HOVIC and HOVENSA main supply period, indicates that their gasoline supply may have been a substantial factor in causing the MTBE contamination at the site.[105]

Through a motion to strike, HOVIC and HOVENSA ask the Court to disregard the Summary Charts, which contain data related to HOVIC and HOVENSA's significant supply of gasoline to Puerto Rico. However, the Summary Charts are admissible under Rule 1006 of the Federal Rules of Evidence ("FRE") because all of the underlying documents, many of which HOVIC and HOVENSA in fact produced in discovery, are admissible. The parties are engaged in ongoing efforts to negotiate a stipulation for the authenticity of documents.[106] The Court need not scrutinize the form of the Summary Charts at the summary judgment stage provided that the

---

**102.** *Prado Alvarez*, 313 F.Supp.2d at 76; *see also City of New York*, 725 F.3d at 115–16 (upholding a finding of liability based on largely circumstantial evidence).

**103.** *See* Pl. 56.1 ¶¶ 67, 72, 84–93, 101–106, 112–116.

**104.** While I did not find Moreau's general testimony in *City of Fresno* regarding service station releases convincing enough to defeat summary judgment, his testimony in this case is more detailed and less speculative due to additional circumstantial evidence, especially concerning the realities of gasoline distribution and supply in Puerto Rico. In *City of Fresno*, plaintiff repeatedly offered a bare, unsupported expert opinion that releases "were routine," without providing much in the way of specifics. *See* Plaintiff City of Fresno's

Opposition to Defendants' Motion for Summary Judgment for Lack of Evidence Pertaining to Causation, No. 04 Civ. 4973 (S.D.N.Y. Apr. 13, 2013) (Dkt. 193) at 22. By contrast, the facts here support more specific conclusions about how and when releases occurred, as well as more general conclusions regarding the nature of the USTs.

**105.** Whether there was any actual injury at Trial Site No. 10 is the subject of a separate summary judgment motion, which I will address in a separate opinion. *See* Dkt. 463.

**106.** *See* Plaintiff's Opposition to Defendants HOVIC and HOVENSA's Motion to Strike Plaintiff's Exhibit 1 Attached to Nathan Short's Declaration ("HOVIC/HOVENSA MTS Opp.") at n. 7.

contents of the charts are admissible.[107] Here, the contents are admissible. Contrary to HOVIC and HOVENSA's contentions, the DACO Report, which defendants also rely on in this action, is not untrustworthy. The Summary Charts incorporating information from the DACO Report merely reflect routine calculations of the type permitted by FRE 1006 demonstrating the percentage that HOVIC and HOVENSA's gasoline supply bears to the annual distributions of gasoline in Puerto Rico by the majors. Lastly, all portions of the Summary Charts are relevant inasmuch as they provide circumstantial support to the Commonwealth's product tracing efforts. Moreover, certain statistics contained within them are corroborated by defendants' own expert.[108] Accordingly, HOVIC and HOVENSA's motion to strike is denied.

To be sure, successfully tracing the gasoline from a specific supplier to a trial site, and proving that *that* supplier's gasoline contained MTBE *and* was present during a release at that trial site, is a tall order. And some, though not nearly all, of the Commonwealth's arguments regarding leaking USTs are somewhat similar to the overly speculative ones I deemed insufficient to withstand summary judgment in *City of Fresno*. But because there is stronger evidence here, I cannot, as defendants urge, rule on causation as a matter of law. There is an important, fine-tuned distinction between the challenge of proving liability based on disputed circumstantial evidence at trial, and the burden a

plaintiff must meet to survive summary judgment. Defendants conflate the two. A reasonable jury, resolving most or all of the factual disputes in the Commonwealth's favor, could arrive at a reasonable conclusion that the suppliers' conduct was, more likely than not, a substantial factor in bringing about the Commonwealth's alleged harm. Simply put, there are important factual disputes that prevent the Court from granting summary judgment on *causation* as it pertains to the Core Defendants and HOVIC and HOVENSA.

## C. Whether Chevron Corporation and Chevron USA Once Owned, Controlled or Managed the Bayamon Refinery Is Disputed

At this stage, it is unclear whether Chevron Corporation and/or Chevron USA owned, controlled, or managed the Bayamon Refinery.[109] The Commonwealth has submitted evidence which suggests a possibility that Chevron Corporation and/or Chevron USA played, at minimum, a managerial role at the refinery. For instance, an EPA report lists "Chevron Corporation" under a column entitled "Other (Former) Names of the Site." [110] And while the District of Puerto Rico court opinion on which the Commonwealth relies does not explicitly reference the Bayamon Refinery, it does state that "in April 1984, Chevron Corporation assumed control of Gulf operations worldwide, including those in Puerto Rico." [111] The Bayamon Refinery *is* explicitly mentioned in a press clipping in which Chevron announced that it was seeking bids "for its gasoline business in ... Puer-

**107.** *See Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir.2003), *cert. denied*, 541 U.S. 937, 124 S.Ct. 1663, 158 L.Ed.2d 358 (2004).

**108.** *See* HOVIC/HOVENSA MTS Opp. at 4 & n. 4.

**109.** The Commonwealth has not opposed summary judgment for Chevron International Oil Company, Inc., Chevron Caribbean Inc.,

and Chevron Estrella Puerto Rico Inc. Accordingly, summary judgment is granted to those Chevron entities on all of the Commonwealth's claims.

**110.** Pl. 56.1 ¶ 65.

**111.** *Marti*, 772 F.Supp. at 702.

to Rico," including *"a refinery in Bayamon, Puerto Rico and 275 Gulf and Chevron outlets on the island."*[112] Defendants' argument that these pieces of evidence are irrelevant and inadmissible is not persuasive.[113] Instead, the evidence presents a material dispute of fact over the role Chevron Corporation and/or Chevron USA played at the Bayamon Refinery. Accordingly, summary judgment on the Commonwealth's claims is denied as to Chevron Corporation and Chevron USA.

## VI. CONCLUSION

For the foregoing reasons, the motion for summary judgment is GRANTED in part and DENIED in part, and the motions to strike are DENIED. The Clerk of the Court is directed to close the motions (Dkt. Nos. 474, 544, 568).

SO ORDERED.

---

112. Press Clipping, Ex. 2 to the Blum Decl. (emphasis added). The clipping quoted a senior vice president at *Chevron USA*—not Chevron Corporation.

113. *See* Reply to Plaintiffs' Response to Rule 56.1 Statement in Support of Certain Defendants' Motion for Summary Judgment for

Lack of Causation ¶ 65. This evidence is relevant to historical ownership or operation of the refinery—taken together, each piece of evidence "has a tendency to make" the fact of ownership or operation more probable. FRE 401.